UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHANIE DAUGHENBAUGH,

<table>
<tr><td>Plaintiff,</td><td>No. 15-cv-12390</td></tr>
<tr><td>vs.</td><td>Hon. Gerald E. Rosen</td></tr>
</table>

MACOMB RESIDENTIAL
OPPORTUNITIES, INC., TED E.
DEVANTIER, and ELIZABETH
WILKERSON,

Defendants.
_____/

OPINION AND ORDER REGARDING DEFENDANTS' MOTION
TO DISMISS AND FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on December 8, 2016

PRESENT:  Honorable Gerald E. Rosen
United States District Judge

## I.  INTRODUCTION

This FMLA/ADA/PWDCRA action is presently before the Court on Defendants'

August 29, 2016 Motion to Dismiss and for Summary Judgment.  Plaintiff Stephanie

Daughenbaugh has responded to Defendants' Motion and Defendants have replied.

Having reviewed and considered the parties' briefs, supporting evidence, and the entire

record of this matter, the Court has determined that oral argument is not necessary.

1

Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), the Court will decide this matter on the briefs. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

Plaintiff Stephanie Daughenbaugh is a former employee of Defendant Macomb Residential Opportunities, Inc. ("MRO"), a company which operates over a dozen licensed assisted living homes for adults with developmental diseases and mental illness. From May 2013 until April 10, 2015 Ms. Daughenbaugh was employed as the Home Manager for four MRO homes -- Country Lane, Cochrane, Hark, and Homestead -- in Washtenaw County, Michigan. As a Home Manager, Plaintiff was responsible for everything that happened in these homes including employee management and scheduling, resident/consumer care, and policy compliance.

Compliance with the law is a critical area of concern for assisted living homes, in general, and, as such, is central to the role of an MRO Home Manager. To ensure compliance, MRO conducts self-audits and annually undergoes an external audit. These audits review a number of factors including home cleanliness/order, staff education/training, and resident care, all of which are the responsibility of the Home Manager.

One of the primary compliance responsibilities of the Home Manager is to ensure that staff follows each resident's Individual Plan of Service ("IPOS"). An IPOS is developed for each resident in conjunction with  the Washtenaw County Community

2

Support and Treatment Services Department "(CSTS"), which includes doctors, nurses, psychiatrists, family members, and other professionals who are charged with overseeing care of each resident.

Another critical area of concern for any assisted living facility is resident rights. Complaints of violations of residents' rights are investigated by governmental agencies, and if substantiated, remedial action is ordered.  Offenses are also logged into a statewide database which tracks each offense, offender, and the offender's facility.

MRO tracks and reports resident rights complaints at its facilities on an annual basis in its Outcomes Management Report ("OMR") which is prepared for external auditors who determine the accreditation of MRO's facilities.  By mid-2014, signs were beginning to appear in MRO's tracking of its facilities of a substantial deficiency of care in the homes managed by Plaintiff.

The 2013-14 OMR revealed that Washtenaw County (Plaintiff's area) had between four and nine times the number of complaints of Neglect III than other counties serviced by MRO.[1]  This same report showed that the Country Lane facility, which was

---

[1]  "Neglect Class III" is defined by Washtenaw County as either of the following:

1.  Acts of commission or omission by an employee, contract employee or volunteer, which result from noncompliance with a standard of care required by law, rules, policies, guidelines, procedures, written directives of individual plan of service which either placed or could have placed, a recipient at risk of physical harm or sexual abuse.

2. The failure to report apparent or suspected Abuse Class III or Neglect

managed by Plaintiff, scored lowest in compliance with state/local law in keeping accurate and required health, medical and behavioral data for each consumer and had the lowest Safety Audit score out of all of the 16 MRO homes.

Plaintiff's Washtenaw County homes were also consistently among the highest in staff overtime, which MRO's Area Supervisor, Elizabeth Wilkerson, testified was a function of mismanagement by Plaintiff. Repeatedly, employees under Plaintiff's management failed to appear for work and refused to take undesirable shifts, resulting in high employee turnover.

Plaintiff admitted all of these problems in her deposition. [*See* Plaintiff's Dep., pp. 69-73.] Plaintiff further acknowledges that MRO shut down two homes she managed due to the problems. *Id.* at 86-89.

MRO worked with Plaintiff in an attempt to improve the homes she managed. When Plaintiff complained she could not attract and keep quality staff and requested a increase in staff pay, MRO increased starting wages at the homes Plaintiff managed. But even with higher paid staff, Plaintiff was unable to make improvements.

Meanwhile, while these problems were ongoing, in December 2014, Plaintiff requested FMLA time off for bariatric surgery to have a gastric sleeve implanted. It is undisputed that MRO gave Plaintiff the requested time off. She returned to work on

---

Class III of a recipient.

[*See* Defendant's Ex. 4.]

4

January 16, 2015 and faxed MRO her doctor's note indicating she could return to work with no work restrictions.  Shortly after her return, however, Plaintiff requested another two weeks off because she was having difficulty keeping solid food down after eating. MRO granted Plaintiff this leave of absence, as well.

When Plaintiff returned on February 26, 2015 from her second leave, a doctor's note was faxed to MRO indicating that Plaintiff could work 4 hours per day and 20 hours per week.  Despite concerns about whether Plaintiff was able to work within her restrictions, this accommodation was granted.

On March 16, 2015, MRO asked Plaintiff to utilize FMLA intermittent/reduced schedule leave for her time on medically-restricted work, which Plaintiff did.  However, on March 23, 2015, Plaintiff faxed MRO a doctor's note dated March 20, indicating that she could return to "work full time without restrictions."  [*See* Defendants' Ex. 17F.] Plaintiff then emailed MRO's Human Resources Director, Dawn Noblett, and three other MRO employees saying "I just faxed over my note from the doctor stating that I can return to 40 hours per week."  [Defendants' Ex. 17G.]  Noblett responded almost immediately stating, "I did get the note but it does not specify 40 hours per week, what it does say is back to work full time without restrictions."  *Id*.  Plaintiff never responded to Noblett's email and admits that she cannot recall talking with anyone at MRO about any concerns with working full time without restrictions.  [Plaintiff's Dep., pp. 167-68.]  She further admitted in her deposition that "full time" to her meant her normal responsibilities

as a Home Manager, which could be 40, 50 or even 60 hours per week.  *Id.* at 164.[2]

Meanwhile, after Plaintiff returned from her two-week February leave, Elizabeth Wilkerson and MRO's Executive Director, Ted Devantier, met with Plaintiff to discuss a number of issues, including multiple substantiated rights violations in homes Plaintiff managed -- two of which occurred in December 2014 before Plaintiff took any medical leave -- as well as staffing problems in her homes.  Plaintiff admits that Devantier and Wilkerson told her she needed to institute more managerial control over the staff, that the problems needed to be corrected and things needed to change.  *Id.* at 106, 112.

Things came to a boil by April 7, 2015, when a resident ("Jane Doe") was discovered with an unexplained black eye at the Country Lane home.  Plaintiff admitted in her deposition that Jane Doe had been the subject of years of close, strict and escalating care by Washtenaw CSTS, MRO, and Doe's family.  *Id.* 186-91.  Plaintiff, in fact, testified that Jane Doe had the highest level of care of all of the residents she oversaw.  *Id.* at 188.  Jane Doe's care was so closely monitored and controlled that in the six months leading up to this injury, CSTS required bi-weekly meetings with MRO to ensure proper care.  *Id.* at 191.

---

[2]  During this litigation, Plaintiff produced a doctor's note dated March 25, 2015 -- i.e., two days after having faxed the "full time" note -- specifying a limitation of 40 hours per week.  *See* Defendants' Ex. 18.  However, MRO was never provided with this note while Plaintiff was still employed, and unlike other notes and correspondence from Plaintiff or her doctors, there is no indication on the note of it every having been mailed, faxed of delivered in any other way to MRO.  Nor can Plaintiff recall how she allegedly delivered it.  *See* Plaintiff's Dep., pp. 171-73.

The increased frequency of these meeting was in part a response to CSTS's dissatisfaction with Plaintiff's oversight of Jane Doe's care, and, in particular, her lack of communication with CSTS staff, which Plaintiff admits. *Id*. at 191-93. Plaintiff also admitted that her relationship with CSTS, especially the CSTS supervisor, significantly deteriorated in her final six months to the point where she was unprofessional in how she interacted with CSTS staff. *Id. See also* Defendants' Ex. 12.

MRO policy and Jane Doe's IPOS required immediate contact with Doe's guardian and CSTS for all incidents. *See* Ex. 13, 13A and 13B. However, when Jane Doe's injury was discovered on April 7, Plaintiff did not contact any of these people.

On April 8, 2015, when other MRO employees, including Plaintiff's assistant manager, Amanda Mills, learned of the injury and mentioned to Plaintiff the IPOS contact requirements, Plaintiff responded, "F--- that bitch, [I'm] not calling anybody. They can read the I.R. [incident report] on Encompass [the electronic reporting system]." [Amanda Mills Aff., Defendants' Ex. 10A ¶¶ 19-20.][3]

Elizabeth Wilkerson learned of the injury the following day when a staff worker called her and told her nobody had contacted Doe's guardian or CSTS workers. [Wilkerson Dep., Defendants' Ex. 6, p. 186.] Wilkerson immediately made the appropriate contacts. *Id.*

---

[3]   At the request of Elizabeth Wilkerson the following day, the assistant manager memorialized Plaintiff's comments in writing on April 10, 2015. *See* Ex. 14.

7

The next day, April 10, 2015, after upper management learned of the incident, MRO terminated Plaintiff's employment.  Plaintiff's Employee Separation Form states that Plaintiff was discharged for "insubordination" and "misconduct," with the following explanation:  "Termination due to poor management, unprofessional conduct, continued poor judgment."  *See* Defendants' Ex. 16.

On July 10, 2015, Plaintiff instituted this wrongful termination action claiming that in terminating her employment, Defendants violated the Family Medical Leave Act, the Americans with Disabilities Act, and Michigan's Persons with Disabilities Civil Rights Act.  Discovery now has closed and Defendants have moved for summary judgment and to dismiss Plaintiff's Amended Complaint, in its entirety.

III.  DISCUSSION

A.   APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

8

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). The Court will apply the foregoing standards in deciding Defendants' motion for summary judgment in this case.[4]

B.   PLAINTIFF'S FMLA CLAIMS

The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* (the "FMLA"), entitles an eligible employee to a total of 12 weeks of leave per year for various reasons, including "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). When medically necessary, such leave may be taken intermittently or on a

---

[4]   Though Defendants also moves for dismissal pursuant to Fed. R. Civ. P. 12(b)(6), because matters outside the pleadings are presented, pursuant to Fed. R. Civ. P. 12(d), the motion must be treated as one for summary judgment.

9

reduced leave schedule. *Id*. § 2612(b)(1). Two distinct theories for recovery on FMLA claims are recognized in the Sixth Circuit: (1) the "entitlement" or "interference" theory arising under 29 U.S.C. § 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising under 29 U.S.C. § 2615(a)(2). *Seeger v. Cincinnati Bell Tel. Co*., 681 F.3d 274, 282 (6th Cir. 2012).

1.    PLAINTIFF HAS FAILED TO MAKE OUT A COGNIZABLE FMLA
       RETALIATION CLAIM

To establish a *prima facie* case of FMLA retaliation, the plaintiff must show by a preponderance of the evidence that (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Seeger*, 681 F.3d at 283; *Donald v. Sybra, Inc*., 667 F.3d 757, 761 (6th Cir.2012). Where, as here, the plaintiff relies on indirect evidence, the claim is evaluated under the *McDonnell Douglas*[5] burden-shifting framework. *Seeger*, 681 F.3d at 283; *Donald*, 667 F.3d at 762; *Edgar v. JAC Prods., Inc*., 443 F.3d 501, 508 (6th Cir.2006). Thus, once a plaintiff offers sufficient indirect evidence to support his or her *prima facie* FMLA claim, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for

---

[5] *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 668 (1973).

the employment decision.  *Seeger*, 681 F.3d at 284.  If the employer articulates a legitimate reason for its action, the burden of production shifts back to the plaintiff to demonstrate pretext.  *Id.* at 285. A plaintiff may show pretext by demonstrating that the proffered reason (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action. *Id*.

MRO does not dispute that Plaintiff here has made out the first three elements of a *prima facie* FMLA retaliation claim but disputes Plaintiff's satisfaction of the fourth element -- the causal connection requirement.  To satisfy this element, Plaintiff relies solely on the temporal proximity of her alleged submission of a 40-hour "reduced schedule" request on March 25 and her termination on April 10, 2015.  MRO contends that temporal proximity is insufficient to satisfy the causal connection element.  MRO is mistaken.

Sixth Circuit precedent permits an FMLA plaintiff to establish a *prima facie* showing of a causal connection based solely on temporal proximity.  *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) ("We agree with the district court that the nearness in time between Seeger's return from FMLA leave and his termination -- three weeks after his reinstatement and less than two months after he first notified CBT of his medical leave -- suffices in these circumstances to meet the low threshold of proof necessary to establish a *prima facie* case of retaliatory discharge."); *see also Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir.2007) (holding that the

11

three-month time lapse between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work established a causal connection at the *prima facie* stage); *Clark v. Walgreen Co*., 424 F. App'x. 467, 473 (6th Cir.2011) (per curiam) ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two.  Our precedents stand for the principle that timing matters.")

However, even though Plaintiff  has met the low threshold of establishing a *prima facie* case, Defendants have proffered a legitimate non-discriminatory reason for her termination --  her "poor management, unprofessional conduct, and continued poor judgment" as shown by her failure to follow a resident's IPOS's requirement that she contact CSTS immediately following an injury to a resident and her unprofessional comments made in conjunction with her decision not to report the incident.

Plaintiff has not come forward with any record evidence that would create an issue of fact with regard to her having been terminated for her refusal to report a serious injury to a resident and for making an offensive statement -- "F--- that bitch, [I'm] not calling anybody."  Defendant has presented evidence of Plaintiff's comments and decided inaction by way of the Affidavit of Assistant Manager Amanda Mills which Plaintiff has not contradicted.

Plaintiff instead focuses on Ms. Mills' handwritten note memorializing of the incident and argues that the note should be excluded because it is hearsay-within-hearsay

and because the note was not placed in her personnel file.

First of all, as statements of a party-opponent, the statements made by Plaintiff referred to in Mills' note are not hearsay. *See* Fed. R. Evid. 801(d)(2)(A). As for the hearsay form of the statement, at the summary judgment stage, the focus is not on the admissibility of the evidence's form. *DeBiasi v. Charter County of Wayne*, 537 F. Supp. 2d 903, 911 (E.D. Mich. 2008); *Celotex v. Cattrett, supra*, 477 U.S. at 324; 105 S.Ct. at 2553 (explaining that in requiring the nonmoving party to produce evidence to withstand a motion for summary judgment, "[w]e do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial"); *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir.1997) (While "[t]he proffered evidence need not be in admissible *form*, ... its content must be admissible."(emphasis in original)); *McGuire v. Michigan Dept. of Community Health*, 526 F. App'x 494, 496-97 (6th Cir. 2013); *see also Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003), *cert. denied*, 541 U.S. 937 (2004) ("At the summary judgment stage we do not focus on the admissibility of the evidence's form.")

The majority of circuits, like the Sixth Circuit, interpret *Celotex* to permit consideration of evidence submitted at summary judgment in non-admissible form when the evidence "will be reduced to admissible form at trial." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir.1996)(allowing otherwise admissible evidence to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in

13

admissible form).  *See also Gleklen v. Democratic Cong. Campaign Comm., Inc*., 199 F.3d 1365 (D.C. Cir. 2000) (holding that any evidence considered by a court at the summary judgment stage "must be capable of being converted into admissible evidence." *Id*. at 1369); *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3rd Cir. 1990), *cert. denied*, 499 U.S. 921 (1991) (holding that hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that would be admissible at trial); *cf., Garside v. Osco Drug, Inc*., 895 F.2d 46, 50 (1st Cir.1990) ("[A]bsent a showing of admissibility - and none was forthcoming here - appellant may not rely on rank hearsay . . . to oppose proper motions for summary judgment.")  Thus, the Court need not decide whether the Amanda Mills' affidavit or handwritten note itself is admissible.  Instead the focus is on the admissibility of its contents.  *Id*.

In *Fraser*, the plaintiff relied upon her diary in opposing her employer's motion for summary judgment on her ADA claim.  This diary detailed the effects that her diabetes had on her daily life.  The defendant argued that the diary was hearsay evidence, and, therefore, could not be considered by the court.  The Ninth Circuit disagreed.  "It would be sufficient if the contents of the diary are admissible, even if the diary itself is inadmissible."  342 F.3d at 1036.  The court then examined the contents of the diary and found:

> The contents of the diary are mere recitations of events within
> Fraser's personal knowledge and, depending on the circumstances, could

14

be admitted into evidence at trial in a variety of ways. Fraser could testify to all the relevant portions of the diary from her personal knowledge. Fed. R. Evid. 602. If she forgets the exact dates or the details of the events, she may be able to use the diary to refresh her recollection. Fed. R. Evid. 612. . . . If the diary fails to refresh her recollection, she might still be able to read the diary into evidence as a recorded recollection under Fed. R. Evid. 803(5).

Because the diary's contents could be presented in an admissible form at trial we may consider the diary's contents in the Bank's summary judgment motion.

*Id.* at 1037.

Similarly, in *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, the Third Circuit determined

that the district court erred in refusing to consider the affidavit of one of the defendant's

competitors in which he stated that his salespeople complained to him about losing sales

because of defendant's discriminatory pricing. The court explained:

In *Williams v. Borough of West Chester*, 891 F.2d 458 (3d Cir.1989), we noted that Fed. R. Civ. P. 56(e) requires the production, at the summary judgment stage, of evidence " 'as would be admissible at trial' ... and thus 'reduc[ible] to admissible evidence.' " *Id*. 466 at 12. We cited *Celotex v. Catrett*, however, in which the Supreme Court rejected the view that the non-moving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. 477 U.S. at 324, 106 S.Ct. at 2553. We thus concluded that hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that "would be admissible at trial." *Williams*, 891 F.2d at 465-66 n. 12. <u>Here, there is no indication that Spagnola's salesforce would be unavailable to testify at trial. The averments of Spagnola's affidavit are capable of proof through admissible evidence</u> and we will consider them now on de novo review.

909 F.2d at 1542 (emphasis added).

15

Likewise, in this case, there is no indication that Amanda Mills would be unavailable to testify at trial. Therefore, there is no basis for Plaintiff's claim that Ms. Mills' note and affidavit cannot be considered as evidence of Defendants' legitimate reason for her termination.

Plaintiff also argues that Ms. Mills' note cannot be considered be considered because it was not placed in her personnel file. However, Michigan's Bullard-Plawecki Act, upon which Plaintiff relies in making this argument, is not applicable to admission of evidence in federal cases. *See Fewless v. Trinity Health-Michigan*, 2011 WL 5169373 at *8 (W.D. Mich. Oct.31, 2011); *see also Burke v. Health Plus of Mich., Inc.*, 2003 WL 102800 at *8 (E.D. Mich. Jan. 7, 2003) ("[The] Court is bound by the substantive law of the forum state, but applies the procedural law of the federal courts.")[6]

Defendants having proffered a legitimate, non-retaliatory reason for Plaintiff's termination, the burden is upon Plaintiff to show that the reason is pretextual. Plaintiff does not argue that MRO's proffered reasons for firing her, i.e., her failure to report a serious injury to a resident and for making an offensive statement, had no basis in fact or did not actually motivate the action. She does, however, appear to argue that the proffered reason was insufficient to warrant the action by arguing she was treated

---

[6] Furthermore, the note was <u>not</u> required to be kept under the Bullard-Plawecki Act because it was drafted *post*-termination and therefore was not a record "used" relative to Plaintiff's employment. M.C.L. § 423.501(1)(c). Plaintiff cites no authority suggesting that documents of this kind created post-termination are required to be added to a former employee's personnel file.

16

dissimilarly than another employee -- her assistant manager Amanda Mills -- who was suspended, not fired, after being found guilty of a neglect charge.

To validly make out a comparison of her treatment to that of Ms. Mills, however, Plaintiff had to demonstrate that she and Ms. Mills were "similarly situated" in all respects, i.e., they "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992).

Ms. Mills clearly is not "similarly situated" to Plaintiff. Mills' supervisor was Plaintiff; Plaintiff's supervisor was Elizabeth Wilkerson. Mills also lacked the ultimate responsibility that Plaintiff had over the Washtenaw County homes and did not have the history of performance problems Plaintiff had. Finally, Mills did not fail to report an injury while making the type of comment Plaintiff did, which led to her termination. The neglect violation for which Mills was investigated was for a staffing infraction not for a failure to report or making offensive comments. *See* Defendants' Ex. 23. Therefore, pretext cannot be established by a comparison of Plaintiff's treatment to that of Amanda Mills.

In sum, Plaintiff has failed to come forward with any evidence to suggest that MRO's reasons are pretext for discrimination or retaliation. Plaintiff having failed to rebut Defendants' non-discriminatory reasons, the Court will grant Defendants' Motion

17

for Summary Judgment on Plaintiff's FMLA retaliation/discrimination claim.

2.    PLAINTIFF HAS FAILED TO MAKE OUT AN FMLA INTERFERENCE CLAIM

The interference provision of the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided in [the Act]." 29 U.S.C. § 2615(a)(1). Also known as an FMLA "entitlement" claim, the employer violates the act if it interferes with an FMLA-created right to medical leave. *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir.2003). Though there is some overlap between the interference and retaliation theories, *see Weimer v. Honda of Am. Mfg., Inc.*, 356 F. App'x. 812, 815 (6th Cir.2009) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir.2001)), "the requisite proofs differ." *Seeger,* 681 F.3d at 282.  Unlike the retaliation theory which demands proof that "the employer took the adverse action *because of* a prohibited reason,"  *Seeger,* 443 F.3d at 508, the interference theory does not require proof of discriminatory intent; "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred."  *Arban*, 345 F.3d at 401.

Plaintiff here claims that MRO interfered with her FMLA right to work a reduced schedule in February 2015 by repeatedly "harassing and pressuring" her to work more hours than her doctor recommended.  The only evidence Plaintiff has of being ordered to exceed her medically-restricted hours is Plaintiff's September 16, 2016 post-summary-judgment-motion affidavit.  This affidavit, however, is in contradiction of Plaintiff's

earlier deposition testimony.

When questioned in her deposition about her allegation that Elizabeth Wilkerson ordered her to work more hours than permitted by her work restriction, Plaintiff testified as follows:

> Q:     What did Liz tell you exactly?
>
> A [by Plaintiff]:  That it was still my responsibility as home manager to make sure stuff got done, and if it wasn't possible for it to get done by other people then it was my job to make sure it got done.
>
> Q:     And did she tell you that you needed to work in excess of four hours a day?
>
> A:     Not in those words, no.
>
> Q:     Okay.  She told you that you needed to get your job done?
>
> A:     Correct.
>
> Q:     She didn't tell you to exceed the hours that you were supposed to be under restrictions for?
>
> A:     Not in those words, no.
>
> Q:     And the words that she used were you need to make sure that things got done, if other people weren't doing it, you got to; right?
>
> A:     Yes.

[Plaintiff's Dep., p. 150].

It is well-settled that "a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." *Penny v. United Parcel Service*, 128 F.3d

19

408, 415 (6th Cir. 1997); *Reid v. Sears, Roebuck and Co*., 790 F.2d 453, 460 (6th Cir. 1986) (establishing this general principle); *see also France v. Lucas*, 836 F.3d 612, 623 (6th Cir. 2016).

As is evident from the above-deposition excerpt, all that Plaintiff was told was that even though she was working a shortened day, it was still her responsibility to make sure things got done. No evidence of record supports her allegation that she was ordered by MRO to work beyond her FMLA-protected reduced hours. Therefore, Plaintiff cannot make out an FMLA interference claim.

## C.   PLAINTIFF'S ADA AND PWDCRA DISCRIMINATION CLAIMS ARE EQUALLY WITHOUT MERIT

Plaintiff asserts that she is disabled within the meaning of the ADA and the PWDCRA, and that it was because of this disability that Defendants decided to terminate her employment. The PWDCRA "substantially mirrors the ADA." *Donald v. Sybra, Inc.*, *supra*, 667 F.3d at 764. Therefore, "claims under both statutes are generally analyzed identically." *Steward v. New Chrysler*, 415 F. App'x 632, 641 (6th Cir.2011).

To establish a claim of disability discrimination, a plaintiff must first demonstrate a *prima facie* case by showing that (1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Ferrari v. Ford Motor Co.*, 826

F.3d 885, 891-92 (6th Cir. 2016) (citing *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173,

1186 (6th Cir. 1996); *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)

(reaffirming that "*Monette* states the proper test" under the indirect evidence method).[7]

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to

---

[7] Citing outdated case law, *Sullivan v. River Valley School Dist*., 197 F.3d 804, 810 (6th Cir. 1999), Plaintiff mistakely states that only three elements are required to establish a *prima facie* disability discrimination claim:  "(1) the employee is a disabled person within the meaning of the ADA and the PDCRA [sic], (2) she is qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) she suffered an adverse employment decision as the result of her disability." [Plaintiff's Response Brief, p. 7.]  The Sixth Circuit, however, has expressly rejected the three-element test and held that *Monette* states the proper test.  *See Whitfield v. Tennessee*, *supra*, 639 F.3d at 260:

> [T]he three-element *Mahon* formulation of a *prima facie* case makes little sense, as its third element -- whether the employee was, in fact, discharged because of the disability -- requires at the *prima facie* stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary. The five-element *Monette* formulation, on the other hand, properly tracks the formulation for a *prima facie* case used in *McDonnell Douglas* itself. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Further, *Monette* is cited for the formulation used in *Mahon* [*v. Crowell,* 295 F.3d 585 (6th Cir. 2002)], and although *Monette* includes the three-element language, it is not used in the context of establishing a *prima facie* case for purposes of *McDonnell Douglas*, but is rather in the context of what is required for recovery under the ADA. *Monette*, 90 F.3d at 1179. Thus, it appears as though the *Mahon* court misread *Monette*. Because conflicts between published cases are resolved in favor of the earlier case, we adopt *Monette*'s five-element test for a *prima facie* case of employment discrimination under the ADA. *United States v. Allen*, 619 F.3d 518, 524 n. 2 (6th Cir.2010).

639 F.3d at 259.

"offer a legitimate explanation for its action." *Ferrari,* 826 F.3d at 892; *Monette*, 90

F.3d at 1186. If the defendant does so, the burden then shifts back to the plaintiff, who

"must introduce evidence showing that the proffered explanation is pretextual." *Id.* As in

the FMLA context, discussed above, an ADA/PWDCRA plaintiff can establish pretext

by showing: (1) that the proffered reasons had no basis in fact, (2) that the proffered

reasons did not actually motivate the employer's action, or (3) that they were insufficient

to motivate the employer's action. *Ferrari* 825 F.3d at 895 (citations omitted).

Defendants do not dispute Plaintiff's satisfaction of elements 2, 3 and 4 of a *prima*

*facie* claim but argue that she has not established that she is disabled under the ADA

because she has not shown that her inability to consume solid food "'substantially

impaired' one or more of her major life activities", has not identified specifically what

major life activities are impaired, or the duration or frequency of any limitation, and has

not established that her termination or treatment by her employer was "solely" based on

her disability.

Defendants apparently are unaware that the Americans with Disabilities

Amendment Act of 2008 (the "ADAA") and regulations promulgated thereunder, relaxed

the previously required showing of a "substantial limitation." 29 C.F.R. § 1630.2(j) now

provides:

(j) Substantially limits—

(1) Rules of construction. The following rules of construction apply when
determining whether an impairment substantially limits an individual in a major

22

life activity:

(i) **The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.**

(ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. **An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.** Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. **Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.**

(iv) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, **in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAA.**

(v) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

(vi) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an

23

impairment substantially limits a major life activity.

(vii) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

29 C.F.R. §1630.2(j)(1) (emphasis added). *See also Reeder v. County of Wayne*, 177 F. Supp. 2d 1059 (E.D. Mich. 2016) (Pursuant to the ADA amendments Act of 2008, "courts are to broadly construe the term 'substantially limits' in favor of expansive coverage, so that it is not a demanding standard." (citations omitted).)

Defendants also overlook that the Sixth Circuit, in a 2012 *en banc* decision, determined that the sole-causation standard does *not* apply to claims under the ADA. *See Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 3317 (6th Cir. 2012) (*en banc*).

In any event, it is not necessary for the Court to determine whether, under the appropriate standards, Defendants are correct in their argument that Plaintiff has failed to make out a *prima facie* disability discrimination case, because, even assuming *arguendo* that Plaintiff has done so, as set forth above in this Opinion, Defendants have articulated legitimate non-discriminatory reasons for their employment decision, and Plaintiff has failed to demonstrate that those reasons were pretextual.[8]   Therefore, Plaintiff has failed to state a legally cognizable ADA or PWDCRA claim.

---

[8] Plaintiff has not separated her FMLA, ADA and PWDCRA arguments and the Court finds it unnecessary to do so here, either.

24

CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment

**[Dkt. # 27]** is GRANTED.  Accordingly,

IT IS FURTHER ORDERED that this case be DISMISSED, in its entirety, with

prejudice.

Let Judgment be entered accordingly.


s/Gerald E. Rosen
United States District Judge

Dated:  December 8, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on December 8, 2016, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135